DEPARTMENT OF PUBLIC UTILITIES *v.* ARKANSAS
LOUISIANA GAS COMPANY.

4-4640

Opinion delivered June 28, 1937.

*Thomas Fitzhugh,* for appellants.

*H. C. Walker, Jr.,* and *Moore, Gray, Burrow &
Chowning,* for appellee.

*P. A. Lasley, amicus curiae.*

GRIFFIN SMITH, C. J. General Order No. 13 was is-
sued by appellant on April 13, 1935. It directed public
utility companies doing business within the state, as
defined in § 1 of act 324 of 1935, to file with the De-
partment of Public Utilities all schedules of rates in effect
as of April 2, 1935. In response to this order, appellee,
a Delaware corporation doing business in Arkansas, filed
a partial schedule. From this report there was omitted
the schedule of rates charged for certain classes of ser-
vice. Included in the class of service for which no sched-
ule was filed were about forty customers who purchased
large quantities of gas for industrial purposes, and five
classified as customers buying at wholesale and engaged
in retail distribution to individual customers.

On November 4, 1935, the Department issued a citation, requiring the respondent-appellee to show cause why it should not file schedules applicable to the class of business not included in the former report, and for convenience these customers will be referred to as pipe line customers.

The response filed with the Department was an allegation that the sales in question constituted transactions in interstate commerce, and therefore the Department was without power to regulate. The cause was set for hearing. Evidence was introduced, witnesses were examined and cross-examined, and a brief was filed by the respondent. Thereupon, the Department made a finding of facts, as follows:

"The respondent owns natural gas acreage in Northern Louisiana and in the Clarksville field in Arkansas, and produces gas from the acreage in each state. The respondent owns and operates a pipe line extending from the Clarksville field to Little Rock, and by means of this line supplies six or seven of its own city distribution plants with gas produced in that field. In addition to supplying gas to its own distribution plants respondent sells gas from that field to Empire Southern Gas Company, Arkansas Western Gas Company, and the Little Rock Gas & Fuel Company. Each of these companies resells and distributes the gas so purchased to consumers through city distribution plants. All of the gas produced in the Clarksville field is transported, sold, distributed and consumed exclusively in Arkansas.

"During the hearing the respondent filed schedules showing charges for gas produced in the Clarksville field and sold and delivered to Empire Southern Gas Company and Arkansas Western Gas Company.

"The gas produced by respondent in Louisiana is, along with gas purchased in that state, turned into a pipe line system owned and operated by respondent and by means of rock pressure, or compressor stations, strategically located, forced under high pressure ranging from 150 to 200 pounds per square inch, to points of consumption or delivery for resale to consumers in the

states of Arkansas, Louisiana and Texas. The re-spondent owns and operates three pipe lines and leases and operates another, all of which are laid across the line between the states of Arkansas and Louisiana. These lines are identified as lines A, C, H and K. Line C was not used for transporting gas into Arkansas at the time of the hearing and had not been for some time prior thereto; therefore, no further reference will be made to Line C.

"Line A crosses the Arkansas-Louisiana line some eight or ten miles east of a point where the states of Arkansas, Louisiana, and Texas join. This line extends in a northeasterly direction from the state line crossing, to the southwestern corporate limits of the city of Little Rock. Line H is not owned, but is leased and operated, by the respondent and crosses the line between the states of Arkansas and Louisiana some fifteen or twenty miles east of Junction City, Arkansas, and extends in a northwesterly direction to what is designated as Crusader Station No. 1 in Union county, Arkansas. Line K crosses the line between the states of Arkansas and Louisiana a few miles east of where said state line is crossed by Line H and extends in a northwesterly direction to the Barton Compressor Station located a short distance north of the city of El Dorado, and continuing thence in a northwesterly direction to the city of Camden, Arkansas. By means of Line E, extending from the Trees Compressor Station located on Line A near Emmett, Arkansas, in a southeasterly direction to Barton Compressor Station, and by means of Line E-1 (in reality an extension of Line E), Lines A, H, and K are interconnected.

"Lines A, E, H, and K constitute the principal or primary transportation system of respondent in South Arkansas. Laterals or spurs have been built from these lines for the purpose of serving industries and city distribution plants along and, in some instances, far removed from the location of said transmission lines. All gas transported into Arkansas by respondent moves through one or more of said lines, or laterals, or spurs

thereto, in reaching a place of consumption. By means of said lines gas is transported and delivered to the gateway of more than fifty city distribution plants in Arkansas owned by the respondent, to approximately 318 rural customers along the lines, and to the pipe line customers.

"In addition to the lines hereinabove described, there are in what is called the El Dorado District, a vast number of lines, primarily constructed and now generally used, to distribute gas to oil wells and petroleum industries located in this area and not to transport gas beyond or through it.

"All of the gas transported by respondent from the state of Louisiana into the state of Arkansas is consumed in Arkansas, with the exception of a relatively small amount consumed by citizens in Texarkana, Texas, and Junction City, Louisiana, served through city distribution plants.

"The gas moves across the Arkansas-Louisiana states line through each of Lines A, H and K for the purpose of serving the respondent's customers in Arkansas. At times the principal portion of this demand is supplied through Line A; at other times through either, or both, Line H or K. When the principal supply of gas is brought into Arkansas through Line A a portion of it is diverted into Line E and carried to the El Dorado District, and when the principal supply is carried through either or both, Line H and K, a portion of the gas is diverted through Line E into Line A. The lines in Arkansas are filled at all times with gas under high pressure, in readiness to serve as needed. The movement, volume and pressure of the gas in the pipe line are directly governed by the use of appliances owned by consumers irrespective of whether said consumers are served directly through a tap off of a pipe line or some spur thereof, or through a city or town distribution plant.

"There are 415 customers in Arkansas served through taps on Lines A, E, H, or K, and their laterals or spurs, if we treat each city or town distribution plant

as a customer. These consist of 318 rural consumers, 54 of respondent's city distribution plants, and the pipe line customers consisting of 40 industrial consumers, 2 city distribution plants owned by corporations affiliated with the respondent and one independently owned city plant.

"Line A has 141 taps in Arkansas between the state line and Little Rock, Line H has 117 taps, Line K has 99 taps, and Line E has 23 taps. While it is true that not all of these taps were in use at the time of the hearing, they all have been used at some time or they would never have been made. At the time of the hearing approximately 100 of them were not in use or not assigned directly to consumers.

"In the operation of the system respondent employs what is known as a gas dispatcher who, by reason of experience and consultation of weather reports and other available data, is able to estimate with reasonable accuracy the demands for gas, of not only the system in Arkansas, but in Louisiana and Texas, and accordingly directs the movement of gas in or into the three states. At the time of dispatching the gas he, nor any one else, knows what the demand of any particular customer is, or will be, and he only undertakes to supply sufficient gas to meet the entire system demand.

"The gas supplied to each pipe line customer is supplied under a contract signed by respondent at its general office at Shreveport in the state of Louisiana. To an extent not disclosed by the record, each of these contracts provides for a minimum charge, or a charge for readiness to serve, without regard to the quantity of gas consumed. While these contracts may vary as to the charges for gas and in other immaterial respects, they all provide that the title to the gas passes to the customer at the outlet side of the meter installed upon his premises, and do not require the customer to take any specific quantity of gas within any given time. He is merely required to take gas in sufficient quantities to supply the individual requirements of his distribution plant or industrial plant, as the case may be. If any

customer's plant happens to be shut down and is not operating, no gas is delivered to him. These contracts further provide that domestic customers, hospitals, schools and such customers as involve the element of human comfort shall be given preference to respondent's gas supply. Each of the contracts also provides that it is subject to the orders, rules and regulations by duly constituted authorities having jurisdiction over either buyer or respondent. There is no actual sale or delivery of gas until such time as the consumer through his own appliances turns the gas to his own burner tips. No gas is sold or delivered to corporations owning and operating distribution plants until the consumers thereof, by means of their own appliances, turn gas to their burner tips. The respondent will serve any prospective pipe line customer who is financially able to pay for the service. The respondent bases its charges for gas delivered to the pipe line customers largely upon the cost of competitive fuels, irrespective of the cost of service. However, it attempts to secure such a price from each of said customers as will give it something more than the actual out-of-pocket expense of the service.

"The tap through which city distribution plants receive gas from the pipe line is known as the city gateway. At each tap through which distribution systems and rural and pipe line customers receive gas, there is installed a pressure regulator which reduces the pressure of the gas from that in the pipe line to 8 or 10 pounds for city distribution and some pipe line customers, and as low as 8 or 10 ounces for other pipe line and rural customers. Irrespective of the pressure at which gas is metered and delivered to the city gateway or consumers, it is billed at a base pressure of 8 ounces above a standard of 14.4 pounds atmospheric pressure. The many rural domestic customers served directly from the pipe line are served under schedules and at the rates prevailing for the same class of consumers served by the nearest city or town distribution plant, and ordinarily the city or town distribution plant employees read the

meters and make and collect the bills for the gas consumed by these rural customers.

"The Arkansas Power & Light Company, one of the pipe line customers, takes large quantities of gas used as a fuel under steam boilers in its electric generating plants in Little Rock and Pine Bluff. Gas at both points is delivered to the power company through a city distribution plant. At Pine Bluff the respondent owns and operates the distribution plant, while that at Little Rock is owned and operated by the Little Rock Gas & Fuel Company, an affiliate of respondent. The respondent charges the distribution plants with all gas passing through their gateway needed to supply their customers and the Arkansas Power & Light Company, and credits each plant with the gas delivered to the power company. The distributing company at Little Rock is paid 1c per MCF for all gas thus delivered to the power company at that point.

"Three of the pipe line customers are corporations separately engaged as public utilities in supplying natural gas by means of city distributing plants to the citizens of Little Rock, Hot Springs, and Camden. These companies are respectively, the Little Rock Gas & Fuel Company, the Consumers Gas Company, and the Camden Gas Company. Part of the gas sold to the Little Rock Gas & Fuel Company is produced in the Clarksville field in the state of Arkansas and transported and delivered exclusively in that state. All of the gas delivered to the Hot Springs and Camden companies is produced in and transported from the state of Louisiana.

"The remainder of the pipe line customers are consumers of gas in industrial plants of various character located in rural territory and are not served by any facilities used in distributing gas through local distribution plants.

"During the first eleven months of 1934 the respondent transported into Arkansas from Louisiana and sold and distributed 15,582,012,000 cubic feet of gas, of which 8,730,616,000 feet were sold to pipe line customers and 6,851,396,000 feet were delivered to respondent's dis-

tribution systems. It is the sale of this 8,730,616,000 cubic feet of gas which the respondent contends is not subject to regulation by the state of Arkansas because of the commerce clause of the Federal Constitution.''

The findings of the department were followed by an order that a schedule of rates, inclusive of those charged customers whose service formed the basis of controversy, be filed; whereupon the respondent filed in the Pulaski circuit court a petition for review. The ruling of the department was reversed. This appeal is from the action of the circuit court in so ruling.

Appellee, in its brief, says that there is little, if any, dispute as to the physical facts, the only variance being as to inferences to be drawn from them. Appellee calls attention to the fact that the production properties and the pipe line system through which gas is transported from Louisiana and delivered into Arkansas were in 1928 acquired by Bethany Oil & Gas Company, a corporation organized under the laws of Delaware in 1920; that its charter gave it the right to produce, buy and acquire natural gas, and only under special contracts, to be entered into for that purpose, to sell such gas to such selected industries and public utilities as the corporation might from time to time elect, but not to itself become a public utility or engage in the business of supplying gas to the public generally. In 1928 the company filed its charter in Arkansas and secured permission to do business in this state. The corporate name was changed to Arkansas Louisiana Pipe Line Company. This company was never granted a franchise to function as a public utility, or to sell gas to the inhabitants of any city or district, and its main office was at Shreveport, Louisiana.

The system consisted of large transmission pipe lines and compressor stations which transported gas from the Louisiana and Texas fields into Arkansas, substantially as set out in appellant's finding of facts. Appellee says that such gas was transported by means of natural pressure from the Texas and Louisiana wells, supplemented by compressor stations, and that it was

discharged into the distribution systems of local distributing companies to which it was sold, and into the pipes of the industrial customers direct from the transmission lines of the pipe line company. The gas was not treated in any manner after it had crossed the state line. It is further claimed by appellee that all of the gas so transported was delivered either to local distributing companies engaged in the distribution of gas in cities and towns, or to large industrial customers along and near the transmission pipe line, and that the sales in such cases were by virtue of special contracts made with such selected industries and local distributing corporations; that the contracts varied in duration, terms and conditions, setting forth the price agreed upon and minimum requirements.

In support of its construction that the business in question constituted interstate commerce, appellee says that in each instance where such sales were made the buyer was responsible for the gas at the point of delivery and metering, adjacent to the transmission lines of the pipe line company. The price depended upon the terms of the special contract and varied with the circumstances of service and of attending competition, a major factor in making prices being availability and cost of other fuels, such as coal and oil.

The business was conducted in this manner until November 30, 1934, when the Arkansas-Louisiana Pipe Line Company was merged with Southern Cities Distributing Company, and the name of the merged corporations was changed to Arkansas-Louisiana Gas Company. Southern Cities Distributing Company owned a number of local distributing plants in towns and cities in Arkansas, and after the merger the Arkansas-Louisiana Gas Company was owner of both the production and pipe line properties of the former Arkansas-Louisiana Pipe Line Company, and of the distribution properties of the former Southern Cities Distributing Company.

The new corporation continued to engage in production and transmission of gas in the same manner

these activities had been handled prior to the merger, with the single exception, as claimed by appellee, that the transmission department was severed and became distinct from the production department.

On September 30, 1935, additional local distributing plants were acquired by appellee, and it now owns all of the severed distribution properties except those at Little Rock, Clarksville, Hot Springs and Camden.

In support of its position that the service involved in this appeal constitutes interstate commerce, appellee says: "Neither Arkansas-Louisiana Pipe Line Company nor Arkansas-Louisiana Gas Company ever undertook to serve from its transmission system all industries applying to it for service. It only served those industries within economic reach of its lines or which it could serve—it selected such customers. Some customers applied to it that it could not serve at all."

Appellee's witness Hamilton testified that there are eleven compressor stations along the pipe line system, the functions of which are to keep the gas in a constant and steady flow; that the gas never comes to rest in the line, but movements are constant until it is delivered to the customer's meters, or to the distributing plants: "From the time the gas is taken into the line in Louisiana at any given time or in any one day, it is in transit until delivered to the customer. The pipe line is merely the vehicle through which the gas is transmitted."

Appellant concedes the general rule laid down by the Supreme Court of the United States that the transportation of natural gas from one state into another is interstate commerce. *West v. Kansas Natural Gas Co.,* 221 U. S. 229, 31 Sup. Ct. 564, 55 L. ed. 716, 35 L. R. A. (N. S.) 1193. This rule has been followed by state and federal courts in many cases. It is contended, however, that the question here is not whether the transportation of gas constitutes interstate commerce, but do the sale, distribution and delivery in Arkansas of gas transported from Louisiana under the facts before us retain the essential characteristics of interstate commerce?

Appellant directs attention to language used by the late Chief Justice TAFT, and applies it to the circumstances we are now dealing with. In *Atlantic Coast Line Ry. Co.* v. *Standard Oil Co.*, 275 U. S. 257, 48 S. Ct. 107, 72 L. ed. 270, the Chief Justice said: "Determination of the character of commerce is a matter of weighing the whole group of facts in respect to it." In *Swift & Co.* v. *U. S.*, 196 U. S. 375, 25 S. Ct. 276, 49 L. ed. 518, it was said: "Commerce among the states is not a technical legal conception, but a practical one drawn from the course of business." See, also, *Foster-Fountain Packing Co.* v. *Haydell*, 278 U. S. 1, 49 S. Ct. 1, 73 L. ed. 147; *Rearick* v. *Penn.*, 203 U. S. 507, 27 S. Ct. 159, 51 L. ed. 295.

It is insisted by appellant that the "original package theory" is applicable to facts of the instant case, and attention is directed to 7 Enc. U. S. Sup. Ct. Rep. 298, where the rule deducible from United States Supreme Court decisions is given, as follows: "The general rule is that as long as an article imported remains in the hands of the importer in the original and unbroken package in which it was imported, it is protected by the commerce clause of the Constitution from interference of state laws, and it is only when the original package has been sold by the importer or has been broken by him, or has otherwise become mixed with the common mass of property in the state, that it becomes subject to state legislation." See *F. May & Co.* v. *New Orleans*, 178 U. S. 496, 20 S. Ct. 976, 44 L. ed. 1165; *Commonwealth* v. *Paul*, 148 Pa. 559, 24 Atl. 78; *Kaster* v. *Flannelly*, 96 Kan. 372, 152 Pac. 22; P. U. R. 1916C, 810; *West Va. & Maryland Gas Co.* v. *Towers*, 134 Md. 137, 106 Atl. 265; P. U. R. 1919D, 332; *East Ohio Gas Co.* v. *Tax Commission*, 283 U. S. 465, 51 S. Ct. 499, 75 L. ed. 1171.

In each of these cases the court held that the original package of gas transported from one state to another was broken when the commodity was turned into a city distribution plant. Appellee admits this construction, and does not contend that sales made by it to city distributing plants, as such, are protected as interstate commerce, but undertakes to distinguish this class of

commerce from the individual sales made from its pipe lines to selected customers.

Among decisions relied upon by appellee is *Pennsylvania Gas Co.* v. *Public Service Comm.*, 225 N. Y. 397, 122 N. E. 260. The opinion was written by Mr. Justice CORDOZO, then Associate Justice of the Court of Appeals of New York, now Associate Justice of the United States Supreme Court. Mr. Justice CORDOZO there said: "The rule of the 'original package' is not an ultimate principle. It is an illustration of a principle. It assumes transmission in packages, and then supplies a test of the unity of the transaction. If other forms of transmission are employed, there is need of other tests." Again, in *Baldwin* v. *Seelig*, 294 U. S. 511, 55 S. Ct. 497, 79 L. ed. 1032, 101 A. L. R. 55, Mr. Justice CORDOZO said: "The test of the 'original package,' which came into our law with *Brown* v. *Maryland*, 12 Wheat. 419, is not inflexible and final for the transactions of interstate commerce, whatever may be its validity for commerce with other countries * * *. There are other purposes for which the same merchandise will have the benefit of the protection appropriate to interstate commerce, though the original packages have been broken and the contents subdivided. * * * In brief, the test of the original package is not an ultimate principle. It is an illustration of a principle. *Pennsylvania Gas Co.* v. *Public Service Comm.*, 225 N. Y. 397, 403, 122 N. E. 260."

Finally, in summing up its case, appellee says: "Appellant contends that failure to earmark or segregate any of the gas produced in Louisiana, when placed in the pipe line system in that state for delivery to any particular customer in Arkansas, prevents such gas from moving in and being a part of interstate commerce. But gas from its very nature is incapable of being earmarked for any particular destination or customer. It is a *quasi*-fluid substance and no one molecule can be segregated from another. It is impossible to identify any particular quantity of gas in a pipe line. That the Supreme Court of the United States has recognized this fact is shown by numerous decisions. In many of them gas was trans-

ported from one state to another and in the latter de-
livered to a large number of local distributing corpora-
tions. In all of these cases it was, of course, obviously
impossible to earmark the gas when placed in the pipe
line for delivery to any particular one of the local com-
panies to which it was to be delivered in the state of
destination; nevertheless, in all of them the court held
that the transaction constituted interstate commerce and
was not subject to local regulation. In *Eureka Pipe
Line Company* v. *Hallanan,* 257 U. S. 265, 42 S. Ct. 101,
66 L. ed. 227, all of the oil was produced in West Vir-
ginia and in that state placed in a pipe line extending into
Ohio. The producers, however, reserved the right to
divert quantities of oil from the pipe line while still in
West Virginia and before it crossed the line into Ohio.
Manifestly, it was impossible to earmark or segregate
any quantity of oil when put in the pipe line in West Vir-
ginia and say it was to be delivered in Ohio. Yet the
Supreme Court held that all of the oil delivered in Ohio
was the subject of interstate commerce.

"In *Public Utilities Commission* v. *Attleboro Steam
and Electric Co.,* 273 U. S. 83, 47 S. Ct. 294, 71 L. ed. 549,
the greater part of the electricity produced in Rhode
Island was diverted for use in that state before it passed
into Massachusetts. It was impossible to earmark that
part of the electricity which was to be transported in
Massachusetts. But the court held that the transporta-
tion of that part which did reach Massachusetts was
interstate commerce, not subject to local regulation. In
*Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282,
42 S. Ct. 106, 66 L. ed. 239, none of the grain pur-
chased in Kentucky for shipment into Tennessee could
be earmarked as destined for any particular customer in
the latter state. But again the court held that its pur-
chase and transportation was interstate commerce, free
from state interference.

"As heretofore remarked in discussing the original
package doctrine, such considerations cannot apply to
the interstate transportation and delivery of gas. From
the very nature of the substance transported, the only

true test is that of continuity—that is to say, continuous movement from the time the gas is placed in the pipe line in the state of production until its delivery to the customer in the state of destination. The Supreme Court of the United States in *Missouri* v. *Kansas Gas Company,* 265 U. S. 298, 44 S. Ct. 544, 68 L. ed. 1027, said: 'The transportation, sale, and delivery, constitute an unbroken chain, fundamentally interstate from beginning to end, and of such continuity as to amount to an established course of business. The paramount interest is not local, but national, admitting of and requiring uniformity of regulation.' ''

From these comments in appellee's brief, it will be seen that there are two considerations upon which reliance is placed to impress with interstate characteristics the gas sold to its pipe line customers: (a) There must be continuous movement from the time the gas is placed in the pipe line in Louisiana until delivery to the customer in Arkansas; and (b) the transportation, sale, and delivery must constitute an unbroken chain from beginning to end—of such continuity as to amount to an established course of business.

The most recent decision of the Supreme Court of the United States bearing directly upon the subject is *Southern Natural Gas Corporation* v. *Alabama,* 301 U. S. 148, 57 S. Ct. 696, 81 L. ed. 695. The gas corporation owned and operated an interstate transmission line extending from the gas fields of Northern Louisiana to Atlanta, and Columbus, in Georgia. Gas purchased by the corporation in Louisiana and Mississippi was transported through its line into Alabama, where supplies were withdrawn from the interstate line and delivered to customers, there having been four such customers in Alabama. Three of these customers were doing an exclusive intrastate business in supplying public utilities. The fourth customer was the Tennessee Coal, Iron & Railway Company. This customer purchased gas for itself and affiliated companies for use as fuel, and was not a distributor of public utilities.

It was urged by the gas corporation that its business in Alabama was wholly interstate, and therefore a franchise tax levied by the state was a burden on interstate commerce if assessed against the corporation. In denying this contention, the court referred to and re-affirmed *East Ohio Gas Co.* v. *Tax Commission*, 283 U. S. 465, 51 S. Ct. 499, 75 L. ed. 1171, and said: "We observed in that case that 'when the gas passes from the distribution line into the supply mains, it necessarily is relieved of nearly all the pressure put upon it at the stations of the producing companies,' its volume is expanded, and it is divided into the smaller streams that enter the service lines connecting such mains with the pipes on the customer's premises. In that case, the Ohio company furnished gas to consumers in municipalities by means of distribution plants and that activity was held to be not interstate commerce, but a business of purely local concern within the jurisdiction of the state. The court quoted with approval the statement in *Missouri ex rel. Barrett* v. *Kansas Nat. Gas Co.*, 265 U. S. 298, 309, 68 L. ed. 1027, 1030, that 'The business of supplying on demand local consumers is a local business, even though the gas be brought from another state and drawn for distribution directly from interstate mains; and, this is so, whether the local distribution be made by the transporting company or by independent distributing companies. In such case the local interest is paramount, and the interference with interstate commerce, if any, indirect and of minor importance.'

"While the facts of the two cases are not the same, there is a clear analogy. * * * We perceive no essential distinction in law between the establishment of such a local activity to meet the needs of consumers in industrial plants, and the service to consumers in the municipalities, which was found in the East Ohio Gas Co. case, to constitute an intrastate business. As was said in that case: 'The treatment and division of the large compressed volume of gas is like the breaking of an original package, after a shipment in interstate commerce, in

order that its contents may be treated, prepared for sale, and sold at retail.' "

We are of the opinion that gas sold to the pipe line customers, and that diverted through municipal plants in Little Rock and Pine Bluff for use of the Arkansas Power & Light Company, are not transactions in interstate commerce possessing the characteristics necessary to exempt the sales from state regulation.

The record shows that during the first eleven months of 1934, appellee transported into Arkansas from Louisiana and sold and distributed 15,582,012,000 cubic feet of gas, of which only 6,851,396,000 cubic feet were delivered to distribution systems and classified for state regulation. Of the total quantity transported, 8,730,-616,000 cubic feet, or more than half shipped into the state, were diverted to a use arbitrarily classed as interstate.

Quantity would not be a criterion for classification if the transactions constituted sales of a commodity continuously in motion from the time it went into the line in Louisiana until delivered to the customer—that is, if the transportation, sale and delivery constituted an unbroken chain from beginning to end. But they do not. In so far as deliveries to the wholesale customers are concerned (excepting gas supplied to the Arkansas Power & Light Company), appellee, for all practical purposes, maintains a distributing system through which it supplies a service similar in effect to that supplied by a local utilities agency.

Gas in large quantities is turned into the transportation system in Louisiana. There are 1,000 miles of these mains in Arkansas. More than fifty per cent. of the gas supplied goes to customers served under individual contracts. An initial force of from 75 to 170 pounds per square inch must be exerted to set in motion and maintain the primary supply. This pressure cannot be exerted in a practical manner at the initial point of entry in Louisiana, and "booster" stations have been built along the route to keep the pressure constant, or high enough to meet delivery specifications. Requirements

of customers are estimated approximately twenty-four hours in advance, and a "dispatcher" is employed for the purpose of procuring information from hour to hour with respect to what the needs may be.

At all times there is a supply of gas in the thousand miles of mains. This reserve is estimated to be about fifty million cubic feet, or an amount sufficient to meet requirements for several hours. The mains are "tapped" for diversion purposes, and the pressure is reduced substantially and then "metered" to the customer.

It is true that no particular gas pumped into the lines in Louisiana can be labeled as the identical gas supplied to a designated customer, because the nature of the commodity precludes such identification. We might assume, as an illustration, that appellee's dispatcher, during a stated period of ten minutes, directs that gas be pumped into its line at the Louisiana point of entry under a constant pressure of 150 pounds, and it could be ascertained by mathematical calculations that a designated quantity of gas had been set in motion. The rules of physics and of common sense tell us that the quantity thus ascertained and started on its journey is not necessarily the same gas appellee will bill to a designated customer under a specific contract, nor is there any process known to science by which its identity can be known.

Such gas, and all gas pumped into the mains in Louisiana, becomes part of a supply stored along a thousand miles of mains. It is affected by heat and cold, and by climatic variations. Expansion and contraction are attributes of its density and function independently of appellee. An individual customer's "tap" line may be idle, or it may be active. A shut-down by the Arkansas Power & Light Company in Little Rock, a change from steam to hydro-electric service, would affect continuity of supply and demand. In these circumstances, transportation of gas theoretically "scheduled" to reach a point in Southern Arkansas one, two, three or four hours after entering the main, would be delayed indefinitely. According to acknowledged principles this

hypothetical supply first pumped into the mains in anticipation of continued demands in Little Rock might never reach its destination, but on the contrary would remain in the storage facilities to be gradually consumed along the line.

Decisions of state and federal courts are called to our attention, and they are urged as authority for a desired construction. Many of these decisions appear conflicting, and the reasoning in one does not support the conclusions of another. But through most of them runs the general principle promulgated by Chief Justice TAFT, whose theory it was that "Determination of the character of commerce is a matter of weighing the whole group of facts in respect to it. * * * Commerce among the states is not a technical legal conception, but a practical one drawn from the course of business."

The conception to be drawn from the course of appellee's business is that it has developed a practical system whereby, if let alone, more than half of its sales in Arkansas will escape regulation by the state, while at the same time the physical facilities of the state, its resources, its laws and its police protection, are invoked in furtherance of its needs.

The cause is reversed with directions that respondent-appellee's petition for review be overruled, and that General Order No. 13 of the Department of Public Utilities be complied with by appellee.