SOUTHERN KRAFT CORPORATION *v.* HARDIN, COMMISSIONER OF REVENUES.

4-6988                                              169 S. W. 2d 637

Opinion delivered March 15, 1943.

*Gaughan, McClellan & Gaughan,* for appellant.

*Leffel Gentry,* for appellee.

GRIFFIN SMITH, C. J.   Appellants are large users of natural gas and electricity. The question is whether they may enjoin collection of the State two percent sales tax. It is contended the transactions are interstate commerce.

Most of the elements of controversy were present in the appeal prosecuted by Department of Public Utilities in 1937. It was then held that Arkansas Louisiana Gas Company should include in its reports to the Utilities Commission a schedule of rates charged those who purchased gas at what was termed wholesale, under con-

tracts signed in Louisiana. Customers who, it was insisted by the Company, were being served in interstate commerce, had agreed to make stipulated minimum payments, irrespective of quantity used. Contracts provided title should pass to the purchaser when gas was metered for consumption.

Facts found by the Commission are copied in the opinion which reversed the circuit court judgment. See *Department of Public Utilities* v. *Arkansas Louisiana Gas Company,* 194 Ark. 354, 108 S. W. 2d 586; *State of Iowa* v. *Woitha,* 227 Ia. 1, 287 N. W. 99, 123 A. L. R. 884; annotation at pages 892-893.

The Gas Company, after losing to Department of Public Utilities here, carried its case to the United States Supreme Court, where relief was denied. It was held that *"If, as claimed,"* certain of the Company's activities in Arkansas were "parts of interstate commerce," that fact alone would not justify refusal to supply information demanded by the State. *Arkansas Louisiana Gas Company* v. *Department of Public Utilities,* 304 U. S. 61, 82 L. Ed. 1149, 58 S. Ct. 770.

This appeal is from three consolidated suits.[1] As each action was brought the Chancellor temporarily enjoined collection by the Commissioner, but directed that the amounts due, *prima facie,* be paid to the Clerk of the Chancery Court.[2] Aggregate collections as of July 16, 1942, were $113,230.68.

[1] September 27, 1935, Southern Kraft Corporation sued Earl R. Wiseman as Commissioner of Revenues, questioning the State's right to collect sales tax on gas and electricity. Crossett Lumber Company sued Z. M. McCarroll as Commissioner of Revenues January 15, 1938, challenging the State's right to collect sales tax on electricity it purchased. April 24, 1940, Crossett Lumber Company brought another action against McCarroll, alleging that collection of a sales tax on gas it purchased was unauthorized. In all these cases Joe Hardin was substituted as defendant. Murray B. McLeod is now Commissioner of Revenues, succeeding Joe Hardin.

[2] International Paper Company was substituted as plaintiff for Southern Kraft Corporation. July 2, 1942, the temporary injunction was dissolved. When an appeal was prayed the clerk was directed to pay $94,849.11 (the accumulated sum) to a designated escrow agent. At the same time similar orders were made in respect of the two suits brought by Crossett Lumber Company. As to the first Crossett Lumber Company action, $12,281.35 had been paid to the clerk representing taxes paid on electricity. In the second Lumber Company suit $6,100.22 was paid to the clerk as tax on "gas and electricity purchased by the plaintiff." [Inclusion of electricity in the decree seems to have been an error, since the complaint and proof related to gas only.]

Southern Kraft Corporation (now International Paper Company) owns a large paper mill at Camden, Arkansas. Crossett Lumber Company owns a paper mill at Crossett, in this State. Electricity used by the Lumber Company comes over Arkansas Power & Light Company lines under a contract executed January 18, 1936. The Kraft Company's contract with Arkansas Power & Light Company is dated April 27, 1927. Gas is sold to the Kraft Company under a 1927 contract made with Natural Gas Producing Company, but assumed by Arkansas Louisiana Gas Company.

Crossett Lumber Company buys its gas from Mississippi River Fuel Corporation under contract of November 7, 1930.[3]

The Kraft Corporation emphasizes obligations it incurred in 1927 covering a number of years. Whether gas or electricity was used, or not used, payments had to be made. The Monroe gas field was, when contracts were executed, the source of supply contemplated, and necessarily the commodity had to be transported from Louisiana to Arkansas. As to electricity, Arkansas Power & Light Company at that time depended largely upon its Sterlington plant in Louisiana, where natural gas was used to create steam, and in turn steam was utilized in generating electricity. The Gas Company, because service demands were enlarged with increased production of paper, was compelled to build a new pipe line into Camden. It connected with the line leading directly from Arkansas to Louisiana. Arkansas Power & Light Company found it necessary to construct a transmission line from Louisiana to Camden.

---

[3] Contract between Mississippi River Fuel Corporation and Crossett Lumber Company springs from an arrangement between Crossett Timber and Development Company (a subsidiary and affiliate of Crossett Lumber Company) and Louisiana Gas & Fuel Company. [Louisiana Gas & Fuel Company purchased from Crossett Timber and Development Company all gas the Development Company was entitled to under the contract, arising from royalties. Louisiana Gas & Fuel Company then sold the gas to Mississippi River Fuel Corporation under what was termed a "pipeline purchase contract." By this contract Louisiana Gas & Fuel Company engaged to deliver to Mississippi River Fuel Corporation the gas Mississippi River Fuel Corporation had agreed to sell to Crossett Lumber Company under the pipeline sales contract.]

Crossett Lumber Company is but a short distance from Sterlington. Crossett is supplied with electricity by high voltage lines from Louisiana. Gas delivered by Mississippi River Fuel Corporation to Crossett Lumber Company is taken from the Fuel Corporation's main line to a point approximately a mile from Crossett. This "tap" line carries gas under main line pressure until connection is made with intermediate installations, where pressure is reduced for metering purposes, ". . . and in the interest of economy in transporting." Delivery is into the Lumber Company's pipe line, ". . . from which point it goes directly to the various distributing lines of Crossett Lumber Company for its different operations, or into lines of the Public Utilities Company of Crossett." The Utilities Company sells to local consumers; but taxes on these sales are not questioned, and have been regularly paid by consumers.

Appellant Lumber Company says it is the only large industrial consumer of gas in Arkansas supplied by Mississippi River Fuel Corporation, other customers being utilities companies. Stress is placed upon documents made exhibits to testimony of witnesses, showing that under the terms of various contracts Crossett Timber & Development Company (a subsidiary and affiliate of Crossett Lumber Company) is entitled to take as much as five million feet of gas per day from its Louisiana lands. But, it is pointed out, in lieu of taking this gas the operating company (which has drilled wells and is producing gas from Crossett Timber & Development Company lands) is obligated to deliver "this quantity of gas" to Mississippi River Fuel Corporation, and *that* company is obliged to sell and deliver an equal quantity of gas to the Lumber Company at Crossett at the reduced price.[4] Practical effect of these contracts, say appellants, is that Crossett Lumber Company, through its affiliation with Crossett Timber & Development Com-

[4] Records show that in the delivery of this gas by the company operating wells on Crossett Timber & Development Company lands, separate accounts are kept of gas delivered to Crossett Lumber Company by Mississippi River Fuel Corporation, and a different price is paid by Mississippi River Fuel Corporation for *that* gas, as distinguished from the price paid for the remainder produced on Crossett Timber & Development Company lands.

pany, gets gas it is entitled to receive from lands owned by its affiliates in Louisiana.

During 1937 to 1941, inclusive, an average of 63.6% of electricity supplied by Arkansas Power & Light Company to its Arkansas customers came from outside the State, principally from Louisiana.

In addition to appellants' belief that the utility it receives, whether gas or electricity, comes from transactions in interstate commerce, it is argued that *delivery* is not a present sale, but in determining whether the tax may be laid reference must be had to the time contracts were consummated, and as to obligations incurred prior to enactment of the sales tax law, completion of the contracts by present deliveries relates back to the original obligations.

There is the further contention that interstate commerce is discriminated against when gas brought from Louisiana is taxed. This theory considers § 15 of Act 233 of 1935 and § 15 of Act 154 of 1937, which exempt from the sales tax ". . . a portion of all retail sales on articles and/or commodities on which a State privilege tax or license is already collected." No such exemption applies to gas or electricity originating in a foreign state; hence, it is said, commerce of such foreign state is burdened to the extent of the credit or immunity allowed in Arkansas. Specifically, it is asserted that if the gas used by appellants had been produced in Arkansas instead of Louisiana, no sales tax would be due because a tax of 2.6% is assessed against gas severed in this State.

Article 2, § 17, of the Arkansas Constitution is pleaded: "No bill of attainder, *ex post facto* law, or law impairing the obligation of contract, shall ever be passed."

*First—Interstate Commerce*—This court's decision in *Department of Public Utilities* v. *Arkansas Louisiana Gas Company* was that the sales withheld from reports made by the Gas Company were not transactions in interstate commerce. It is true the Supreme Court of the United States did not pass on this direct question; and

it may be that the broken package doctrine upon which our opinion was based was reserved by the higher tribunal because necessity of the controversy only required that the Gas Company be told that specific acts required by the State did not sufficiently burden commerce to justify the relief asked. To now say that gas sold and delivered in circumstances not essentially different from those attending transactions we held were involved in the appeal of 1937 would require that the case be overruled. It follows that unless a different question is now presented, the former decision must control.

Appellants think *Hollis & Company* v. *McCarroll, Commissioner,* 200 Ark. 523, 140 S. W. 2d 420, contains a personal expression by the writer of the opinion indicating sympathy with the principles contended for in the case at bar. We agree that the Hollis decision is not controlling. Facts were entirely different, and the same result might have been reached if there had not been available the rule announced in *McGoldrick, Commissioner of the City of New York* v. *Berwind-White Coal Mining Company,* 309 U. S. 33, 60 S. Ct. 388, 84 L. Ed. 565, 128 A. L. R. 876, and *McGoldrick, etc.,* v. *A. H. DuGrenier, Inc.,* 309 U. S. 70, 60 S. Ct. 404, 84 L. Ed. 584. In citing these cases the writer of the Hollis opinion made comment that he thought the better view was expressed by Chief Justice Hughes in *McGoldrick* v. *Berwind-White.* The reasoning referred to appeared in a dissenting opinion by the Chief Justice, concurred in by Mr. Justice McReynolds and Mr. Justice Roberts. Mr. Justice Stone (now Chief Justice) wrote the majority opinion. It was not intended, in the Hollis case, to say that the construction of transactions involved in *McGoldrick* v. *Berwind-White* was not accepted in its entirety. [The McGoldrick case is reported in 128 A. L. R., p. 901.]

Whether we would, or would not (in the absence of such a decision by the United States Supreme Court defining interstate commerce) adopt the broken package rule is not open to argument. In view of numerous holdings and the logic supporting them, about all the transporter of gas from a designated State can do in disposing

of the commodity in another State without becoming subject to laws in the state of delivery is to cause the gas to be piped to a customer and received by that customer in the most direct and compact practicable form.

If the system through or by which delivery is made—such, for instance, as a pipe line—is used to accommodate business gained in a State other than that of origin, and mechanical processes or physical factors are utilized because, in making delivery, there must be substantial variation of the primary commodity in form, the result is that while gas continues to be the subject of commerce, its characteristics have undergone changes. Its potential is transformed with high and low compression. In certain forms it is useless; in others highly desirable and often indispensable to industry.

The idea to be drawn from court decisions is that when facilities in the state into which a pipe line has been projected are used for the purpose of drawing gas from its primary flow and subjecting it to processes necessity dictates before it is ready for commercial, industrial, or home use, the change thus brought about has been made in the State of delivery as distinguished from the State of origin. It inevitably follows that essential factors have affected value. Because of this conversion in the State where consumption takes place, protection of the commerce clause of the federal constitution has been lost.

If we are correct in this view it becomes unnecessary to determine whether (assuming that gas sold in the circumstances here presented constitutes interstate commerce) the tax is permissive because not an unreasonable burden.

*Second—Legislative Intent to Exempt.*—Acts 233 of 1935 and 154 of 1937 exempt "Retail sales which are prohibited from taxes by the Constitution or laws of the United States of America or by the Constitution of this State." As far back as 1922 it was held that the tax affecting gasoline laid by Act 606 of 1921, p. 685, was not on the sale, but ". . . upon the purchaser of gasoline for the use of the car, and to regulate the busi-

ness of the dealer by requiring him to collect the tax and pay it over to the county treasurer." *Standard Oil Company* v. *Brodie,* 153 Ark. 114, 239 S. W. 753.

In *Wiseman* v. *Phillips,* 191 Ark. 63, 84 S. W. 2d 91, Act 233 of 1935 was construed. The General Assembly's purpose, it was said, "was to impose a tax upon the transaction of a purchase at retail for use or consumption of articles not exempt, and to regulate the business of the retailer by requiring him to collect the tax and pay it over to the Commissioner of Revenues." See, also, *Arkansas Power & Light Company* v. *Roth,* 193 Ark. 1015, 104 S. W. 2d 207. There are but slight distinctions, in principal, between Act 233 of 1935 and Act 154 of 1937.

Conceding what is too plain to admit of argument—that the Legislature intended to exclude from taxation articles, commodities, transactions, or things exempted by the Federal and State Constitutions, it does not follow that gas and electricity brought from another State are not to be taxed. The contrary is true when it is held, as we do, that the sales in question lost the characteristics of interstate commerce.

*Third—Electric Current.*—Comprehensive agreements are involved. Southern Kraft Corporation's contract with Arkansas Power & Light Company is for a period of twenty years. There is a recital that the Power Company ". . . is at present operating a transmission system together with generating stations throughout the State of Arkansas, and especially in the towns of Camden and Pine Bluff." There was a covenant by the Power Company to extend its transmission system to Camden, ". . . and to furnish and install [at Camden] necessary stepdown transformers, together with proper oil switch protection, to furnish the initial requirements of the Paper Company not to exceed 6,500 KW." There was the right upon the part of the Paper Company to increase the demand during the first five years to 13,000 KW. Other rights as to use, quantity and price are set out.

The contract mentions that one of the principal sources from which the Power Company expected to sup-

ply energy was Louisiana Power Company at Sterling-ton, ". . . which power is made obtainable from gas obtained from the top gas strata in the Monroe Gas Field. The Power Company does not guarantee that this power will be obtainable throughout the life of the agreement." In such event certain adjustments were to be made.

Although much of the energy used by appellants comes from Louisiana, there is no method by which it can be shown that at any designated time an ascertained quantity passed in interstate commerce; nor is the contract one which contemplates that the supply shall be interstate and free from Arkansas taxing powers.

Crossett Lumber Company's 1936 contract, like Southern Kraft Corporation's agreement, recites that the Power Company ". . . is at present operating and maintaining an electric power transmission system in the vicinity of Crossett, from which it sells electric service to various industries and to the public generally." It covered a period of ten years, and does not supersede an existing contract made June 12, 1935. Unlike Southern Kraft Corporation's contract, there is no reference to a plan to obtain current from Louisiana.

*Fourth—The Severance Tax.*—It is not necessary to determine whether, if the Lumber Company, or if Southern Kraft Corporation, had owned land in Arkansas from which gas was taken for consumption by the land-owner, a severance tax would be due. Section 4 of Act 118 of 1923 exempts *forest products* utilized by the owner which do not enter into commerce for profit. *Miller Lumber Company* v. *Floyd,* 169 Ark. 473, 275 S. W. 741.

The case also construed *Floyd* v. *Miller Lumber Company,* 160 Ark. 17, 254 S. W. 450, 32 A. L. R. 811. The latter decision was a composite. But for the opinion by Mr. Justice HART in *Miller Lumber Company* v. *Floyd,* it would seem that a majority of the court held Act 118 constitutional in its application to corporations only because the tax could be construed as a charge against franchises. But in the later Floyd case (169 Ark. 473, 275 S. W. 742) it is expressly held that "Whatever views the different members [of the Court] may enter-

tain as to the soundness of our former decision, the four members of the court who made it agree that the decision upholding the validity of the Act as an occupation tax must be regarded as the law of the case.'' Authority for the tax, it was said, is found in § 5, art. 16, of the Constitution which allows the General Assembly to tax privileges in such manner as may be deemed proper.

It would add nothing to the law's lucidity to review the two Floyd cases. The fact remains that Act 118 has been sustained. *State ex rel. Attorney General* v. *Republic Mining & Manufacturing Co.,* 185 Ark. 1119, 52 S. W. 2d 43. The further fact confronts us that the sales tax Act allows credit or rebate ''In an amount equal to whatever is the excess above the already imposed privilege tax or license.''

A majority of the judges hold the view that the severance tax on gas is not such a tax as was contemplated by § 15 of Act 233, and § 15 of Act 154. They rely upon *Bangs* v. *McCarroll, Commissioner,* 202 Ark. 103, 149 S. W. 2d 53, and *Wiseman* v. *Madison Cadillac Company,* 191 Ark. 1021, 88 S. W. 2d 1007, 103 A. L. R. 1208.

Even though the severance tax equivalent (not exceeding two percent) be credited against sales tax, there is no discrimination against foreign commerce. The State's taxing powers are merely applied in a manner thought by the General Assembly to be equitable. Neither of the appellants has paid a severance tax on any of the gas which forms the subject-matter of this litigation, nor has either produced gas upon which a severance tax, or a sales tax, has been paid.

*Fifth—Is the Obligation of Contract Impaired?* Southern Kraft Corporation's complaint pleads art. 2, § 17, of the State Constitution, which forbids enactment of *ex post facto laws,* or laws impairing the obligation of contracts.[5]

---

[5] The term *ex post facto* as used in our Constitution and in the Constitution of the United States, has been construed to relate to crimes, as distinguished from civil actions. See Willoughby on the Constitution of the United States, 2d ed., v. 2, Sec. 684; *Taylor* v. *The Governor,* 1 Ark. 21. In the Taylor case it was said: "An *ex post facto* law declares an offense to be punishable in a manner that it was not punishable at the time it was committed, and relates exclusively to criminal proceedings." (See Pope's Digest, "Attainder, Ex Post Facto Laws," p. 98.)

The obligation of a contract is not impaired because a tax, enacted subsequent to execution of such contract, affects the subject-matter. No one acquires, by contract, a vested right against the State's power to tax within Constitutional limitations. Even an express declaration by the General Assembly that property of a railroad company should be exempt from taxation was held not binding upon the state when the exemption was a mere gratuity. *West Wisconsin Railway Company* v. *Board of Supervisors of Trempealeau Company,* 93 U. S. 595, 23 L. Ed. 814; *Railway Company* v. *Philadelphia,* 101 U. S. 528.

*Sixth—Effect of Act 154.*—Section 23 of Act 154 of 1937 repeals ". . . all Acts and parts of Acts in conflict herewith; and this Act shall repeal Act 223 of 1935, known as the 'Emergency Sales Tax Act'." Section 20-a of Act 233 is: "This Act shall expire and be of no effect July 1, 1937." Act 154 was approved February 26, 1937.

Appellants contend that with repeal of Act 233 all rights under it ceased; therefore suits cannot be maintained. They have evidently overlooked Act 243, approved March 12, 1937. It provides that "Any sales tax due and unpaid under the provisions of Act 233 of 1935, known as the emergency sales tax act, on the effective date of 'The Arkansas Retail Sales Tax Law' of 1937, shall be collected in the same manner and under the same rules of procedure prescribed therefor in said Act 233 of 1935. . . ."

Affirmed.

Mr. Justice CARTER did not participate in the consideration or determination of this case.