MISSISSIPPI RIVER FUEL CORPORATION ET AL., Appellants, v. FORREST
SMITH, State Auditor, Respondent, EVANS & HOWARD SEWER
PIPE COMPANY ET AL., Appellants.—Nos. 37831, 37832.—164 S.
W. (2d) 370.

Division One, April 1, 1942.

As Modified on Denial of Motions to Transfer to Banc and for Rehearing
June 3, 1942.

Further Rehearing Denied, July 28, 1942.

Further Motion to Transfer to Banc Denied, September 8, 1942.

(1)

2

*William A. Dougherty, James A. Potter, Hugh H. Sullivan* and *Sullivan, Reeder, Finley & Gaines* for appellant, Mississippi River Fuel Corporation.

4

*Leland Hazard* for appellant, Pittsburgh Plate Glass Company; *Nicholas R. Criss, Jr.,* of counsel.

6

*Carter & Small* and *Richard S. Bull* for appellant Scullin Steel Company; *McDonald, Bartlett & Muldoon* for appellant Laclede-Christy Clay Products Company; *Nagel, Kirby, Orrick & Shepley* and *Parkhurst Sleeth* for appellant St. Joseph Lead Company; *Fordyce, White, Mayne, Williams & Hartman* for appellants St. Louis Malleable Casting Company and National Bearing Metals Corporation.

*Roy McKittrick,* Attorney General, *Russell C. Stone* and *Tyre W. Burton,* Assistant Attorneys General, for respondent; *John H. Hendren* and *William G. Marbury* of counsel.

BRADLEY, C.—Action under our declaratory judgment act (Sec. 1126 et seq., R. S. 1939, 1 Ann. Stat. (1929), Sec. 1097a et seq., p. 1388 et seq.) to determine whether certain natural gas sales by plaintiff, Mississippi River Fuel Corporation, are subject to our sales tax law (Sec. 11407 et seq., R. S. 1939, 12 Ann. Stat., Sec. 10164b et seq., p. 8118 et seq.). Resistance to the tax is on the ground that the gas sold is transported interstate by pipe line, and that under

8

the facts, the sales involved are not subject to a sales tax. Also, it is contended that Sec. 11409, R. S. 1939, exempts the gas sales from the sales tax. The amount of taxes involved is in excess of $7500, hence the Supreme Court has jurisdiction of the appeal.

Petition was filed by plaintiff, Mississippi River Fuel Corporation, June 15, 1940, against the State Auditor, Smith, and 20 industrial customers of plaintiff fuel company. The Scullin Steel Company and Laclede-Christy Clay Products Company were made defendants in the petition, but on their separate motions they were made parties plaintiff instead of parties defendant. Pending final disposition of the cause, agreements were made whereby the taxes claimed were paid, under protest, to the State Auditor, and a temporary injunction issued enjoining him from paying over to the State Treasurer.

The trial court found that it was the duty of plaintiff, Mississippi River Fuel Corporation, to collect the taxes in question from the named customers and pay same over to the State Auditor. The Mississippi River Fuel Corporation and 10 of the customers appealed. The appeal of the Mississippi River Fuel Company is No. 37831, appeal of the others is No. 37832.

We shall refer to plaintiff, Mississippi River Fuel Corporation, as the Gas Company, and to defendant, Smith, as the State Auditor. The Gas Company is a Delaware corporation, authorized to do business in this state. It operates a 22 inch pipe line from Perryville, Louisiana, through Arkansas and into Missouri, and to what is called Meramec Junction, north of the Meramec river in St. Louis County. The Gas Company purchases, in Louisiana, its gas from producers and delivery is made at Perryville, Louisiana. At the point of delivery, the gas is compressed under a pressure of 400 pounds to the square inch, and then it is passed through coolers and into the 22 inch pipe line. The pressure decreases as the gas flows north in the pipe line, and between Perryville, Louisiana, and Meramec Junction the gas passes through eight compressors where the pressure is restored to 400 pounds. The eighth compressor station north of Perryville is known as the 12 mile station, and is about 12 miles south of Fredericktown, Missouri. The Gas Company has no storage tanks. It keeps up with the amount of gas it will need to supply its customers and purchases, as needed, from producers in the Louisiana field. The pipe line from Perryville to Meramec Junction is about 450 miles in length, and it requires about 24 hours for gas to flow from Perryville to the Junction. The volume content of the pipe line between these two points is about 100,000,000 cubic feet at an average pressure of 250 pounds to the square inch.

At Meramec Junction the 22 inch pipe line is divided into two separate lines; one is called the Missouri line and the other the Illinois line. Upon each of these lines and near the point of take off is an automatic valve called a regulator which controls the flow of gas into the branch line, and at the junction the pressure is substantially

reduced before the gas is sent out into the branch lines. The Missouri line extends generally north, from the Junction, and supplies the Gas Company's customers in the south St. Louis area. The Illinois line extends east, under the Mississippi River, to East St. Louis and Alton, Illinois, and then a section of that line extends west, under the Mississippi River, and into north St. Louis, and supplies the Gas Company's customers in the north St. Louis area.

The Missouri line was described by George M. Parker, the Gas Company's manager, as follows: "Off the 22 inch line two 8 inch lines are extended to a manifold (a single pipe into which a number of pipes feed) and then a 20 inch line, reducing to a 16 inch line and finally to a 10 inch line at its terminus in St. Louis."

Parker described the Illinois line as follows: "The 22 inch line comes into the area (the Junction) just north of the Meramec River and from there three 8 inch lines are extended eastward to a manifold and from there it is extended to four 10 inch lines under the Mississippi River and into another manifold and then another 22 inch line proceeds to East St. Louis and Alton. When the line extends northward from East St. Louis it ends up at Alton a 16 inch line . . . A section of the line, or a 10 inch, comes across the river again into north St. Louis."

The manner of getting gas to a customer is correctly described in the State Auditor's brief as follows: "Adjacent to the Missouri branch line . . . are located a number of Mississippi River Fuel industrial consumers. At that point on the Missouri branch line, adjacent to the industrial consumers, a lateral line, in the form of a supply line, is taken off and goes on to the property of the consumer. Located on the lateral line on the property of the consumer are regulator houses wherein are located regulators. The function of these regulators is to permit only that amount of gas to pass through as is necessary to meet the demands of the individual consumer at a given time. This function of controlling the passage into the consumer's distribution system is brought about by controlling the pressure of the gas on the customer's side of the regulator. Located immediately after the regulators controlling the passage of gas into the customer's plant are located meters for the purpose of metering the gas delivered to the customer. At the outlet of this meter *delivery of the gas takes place.*" The manner of delivery in north St. Louis is the same.

The tax is claimed on the sale of gas to some industrial customers in Missouri, south of Meramec Junction. The manner of delivery to these is described in the Auditor's brief as follows:

"In regard to that phase of plaintiff's operation in the distribution and sale of gas to industrial consumers located on the main transmission line south of the Meramec Junction, each delivery is effected by a small lateral line taking off from the main transmission line. Within a few feet of the transmission line, regulators are placed upon

the lateral line to control the passage of gas into said lateral line. These regulators effect a substantial reduction in pressure from the main transmission line to the lateral line and permit only that amount of gas to pass into the lateral line as is necessary to make available an adequate supply of gas for industrial use. The lateral line then runs over to the industrial consumer's plant, ranging from a few hundred feet to several miles. On the property of the consumer there is again located upon the lateral line a regulator which permits only that amount of gas to pass through as is necessary to maintain an adequate pressure in the distribution system of the customer to assure a sufficient quantity of gas to meet the aggregate consumption requirements of the individual consumer. This regulator effects a substantial reduction in pressure between the customer's side of the regulator and that side of the regulator nearest the transmission line. The points of delivery to the respective customers are the meters located immediately after the last regulator located on the lateral supply line.''

Subsection (c) of Sec. 11408, R. S. 1939, 12 Ann. Stat. (1929), Sec. 10164b, p. 8118, among other things, provides for a sales tax of ''two (2) per cent of amounts paid or charged on all sales of electricity or electrical current, water and gas (natural or artificial), to domestic, commercial or industrial consumers.'' Some of the Gas Company's customers purchase gas for resale, and the State Auditor does not contend that a sales tax should be paid on sales of gas to these companies. The tax is claimed only on sales to industrial consumers.

East Ohio Gas Company v. Tax Commission of Ohio et al., 283 U. S. 465, 51 S. Ct. 499, 75 L. Ed. 1171, involved the right of the Ohio Tax Commission to impose, under the Ohio law, an excise tax (a sales tax is an excise tax) on the gross receipts from business done by the East Ohio Gas Company in Ohio. The district court, three judges sitting, said (43 Fed. (2d) 170): ''The only question for decision in the present case is whether the business of the petitioner, the retail distribution and sale of natural gas in the cities of Cleveland, Youngstown, Akron, etc., is to be regarded as a local and intrastate business subject to the excise tax imposed by General Code, Sec. 5483, or whether such business is so colored by the fact that the gas is brought from West Virginia as to take on the characteristics of, and be classified as interstate commerce, which, it is conceded, cannot be burdened by an excise tax,'' citing U. S. Constitution, Art. 1, Sec. 8; Rosenberger v. Pacific Exp. Co., 241 U. S. 48, 50, 36 S. Ct. 510, 60 L. Ed. 880; New Jersey Telephone Co. v. Tax Board, 280 U. S. 338, 346, 50 S. Ct. 111, 74 L. Ed. 463.

The East Ohio Gas Company was a public utility and furnished natural gas to consumers. It obtained 25 per cent of its gas from its Ohio wells, 72 per cent from the Haze Natural Gas Company of West Virginia, and 3 per cent from the Peoples Natural Gas Company of Pennsylvania. Only the gas from West Virginia was concerned. The

District Court said (43 Fed. (2d) 171): "It must be conceded that . . . the transportation of gas by pipe line from West Virginia to Cleveland is interstate commerce. Such commerce retains its interstate character throughout the entire journey, or for so long as the journey itself is not broken, even though that be to the very burner of the consumer," citing Pennsylvania Gas Co. v. Public Service Comm., 252 U. S. 23, 40 S. Ct. 279, 64 L. Ed. 434; Illinois Cent. R. R. v. DeFuentes, 236 U. S. 157, 163, 35 S. Ct. 275, 59 L. Ed. 517. And in the present case it is conceded that the transportation of the gas from Perryville, Louisiana, to Meramec Junction was interstate commerce, but that when the gas is diverted from the 22 inch pipe line, and into the branches and ultimately measured by the meter on the premises of the consumer, it loses its interstate status, and becomes subject to the tax.

The Supreme Court of the United States held that the manner in which the East Ohio Gas Company furnished gas to the consumers was not interstate commerce. The court said (283 U. S. 470):

"The transportation of gas from wells outside Ohio by the lines of the producing companies to the state line and thence by means of appellant's high pressure transmission lines to their connection with its local systems is essentially national—not local—in character and is interstate commerce within as well as without that State. The mere fact that the title or the custody of the gas passes while it is enroute from State to State is not determinative of the question where interstate commerce ends. Public Utilities Comm. v. Landon, 249 U. S. 239, 245; State ex rel. Barrett, Atty. Gen., v. Kansas Natural Gas Co., 265 U. S. 298, 307-309; Peoples Natural Gas Co. ▮▮▮ v. Pub. Serv. Comm., 270 U. S. 550, 554; Public Utilities Comm. v. Attleboro Co., 273 U. S. 83, 89. But when the gas passes from the distribution lines into the supply mains, it necessarily is relieved of nearly all the pressure put upon it at the stations of the producing companies, its volume thereby is expanded to many times what it was while in the high pressure interstate transmission lines, and it is divided into the many thousand relatively tiny streams that enter the small service lines connecting such mains with the pipes on the consumers' premises. So segregated the gas in such service lines and pipes remains in readiness or moves forward to serve as needed. The treatment and division of the large compressed volume of gas is like the breaking of an original package, after shipment in interstate commerce, in order that its contents may be treated, prepared for sale, and sold at retail. State v. Flannelly, 96 Kan. 372, 383-384, 152 Pac. 22; West Virginia & Maryland Gas Co. v. Public Service Commission, 134 Md. 137, 143-145, 106 Atl. 265. Cf. Atlantic Coast Line v. Standard Oil Co., 275 U. S. 257, 269; Brown v. Maryland, 12 Wheat. 419; Leisy v. Hardin, 135 U. S. 100."

Southern Natural Gas Corp. et al. v. Alabama, 301 U. S. 148, 57 S. Ct. 696, 81 L. Ed. 970, involved the validity of a franchise tax

12

assessed against the Southern Natural Gas Corporation, referred to as the Southern, pursuant to an Alabama statute. It was contended that the tax imposed an undue burden on interstate commerce. The Southern was a Delaware Corporation, authorized to do business in Alabama. It was engaged in the transmission and distribution of gas, purchased by it from producers in the Louisiana and Mississippi fields, and transported through its own pipe lines. It had an office in Birmingham, and its chief place of business was there. The Southern had contracts for the delivery of natural gas, in Alabama, to Alabama Natural Gas Corporation, Southern Cities Public Service Company, Birmingham Gas Company, and Tenn. Coal, Iron & R. Co. All collections for sales were received and disbursement for expenses were made or authorized at the Birmingham office. "All gas delivered in Alabama moved under main line pressure in continuous movement from the wells in Louisiana to the immediate point of delivery in Alabama, where it was reduced in pressure and measured for the sole purpose of effecting delivery." In the present case, the pressure was reduced before the gas passed into the branch lines or to the consumers in this state south of the Junction.

In Southern Gas Corp. et al. v. Alabama, supra, the Supreme Court of the United States affirmed the ruling of the Supreme Court of Alabama (233 Ala. 81, 170 So. 178), holding that the franchise tax was valid. The court said (301 U. S. 1. c. 154):

"From the agreed facts we are unable to conclude that the business thus conducted in Alabama was entirely an interstate business. While the gas which appellant sold was brought into the State from Louisiana, it appears that appellant carried on in Alabama activities of an intrastate character. We had occasion in East Ohio Gas Co. v. Tax Commission, 283 U. S. 465, 470, to consider the distinction between the transportation of gas into a State and the furnishing of the gas so transported to consumers within the State. We observed in that case that 'when the gas passes from the distribution lines into the supply mains, it necessarily is relieved of nearly all the pressure put upon it at the stations of the producing companies,' its volume is expanded, and it is divided into the smaller streams that enter the service lines connecting such mains with the pipes on the consumer's premises. In that case, the Ohio Company furnished gas to consumers in municipalities by means of distribution plants and that activity was held to be not interstate commerce, but a business of purely local concern exclusively within the jurisdiction of the State. The court quoted with approval the statement in Missouri v. Kansas Gas Co., 265 U. S. 298, 309, that 'the business of supplying, on demand, local consumers is a local business, even though the gas be brought from another State and drawn for distribution plants directly from interstate mains; and this is so whether the local distribution be made by the transporting company or by independent distributing companies. In such case the local interest is paramount,

and the interference with interstate commerce, if any, indirect and of minor importance.' "

Arkansas Louisiana Gas Company v. Department of Public Utilities, 304 U. S. 61, 58 S. Ct. 770, 82 L. Ed. 1149, involved the right of the State of Arkansas, under a statute, to compel utilities to file, upon specified forms, schedules of. rates, charges, etc. The Arkansas Louisiana Gas Company filed such schedules for local utility service in the State, but declined to file contracts, agreements, etc. for sales and deliveries to pipe line customers. The Department issued an order to show cause for such failure. The Gas Company, in response, set forth that the sale and delivery of gas from its Texas and Louisiana fields to its pipe line and industrial customers in Arkansas constituted interstate commerce and that in making such sales and deliveries it was not acting as a public utility, and that the sale and delivery of such gas and the rates, schedules, etc. were not matters subject to the jurisdiction of the Arkansas Department. On a hearing, the Department directed compliance with its order. The circuit court of Arkansas held the order of the Department void. Upon appeal the Supreme Court of Arkansas (194 Ark. 354, 108 S. W. (2d) 586) held that the sales and deliveries were not free from state regulation because parts of interstate commerce and directed compliance with the Department order.

The ruling of the Supreme Court of Arkansas was affirmed by the Supreme Court of the United States. The court said (82 L. Ed. 1. c. 1152):

"Appellant operates locally at many places in Arkansas, and also delivers within the State great quantities of gas said to move without interruption from another State. In such circumstances it may be highly important for the State authorities to have information concerning all its operations. We are unable to see that merely to require comprehensive reports covering all of them would materially burden or unduly interfere with the free flow of commerce between the States."

It will be noted that in the East Ohio Gas Company case, supra, the original package rule was invoked. This rule is given in 7 Enc. U. S. Sup. Ct. Reports 298, as follows: "The general rule is that as long as an article imported remains in the hands of the importer in the original and unbroken package in which it was imported, it is protected by the commerce clause of the Constitution from the interference of state laws, and that it is only when the original package has been sold by the importer or has been broken up by him or has otherwise become mixed with the common mass of property in the State, that it becomes subject to state legislation." Application of the rule to the sale of gas is succinctly stated in West Virginia & Maryland Gas Co. et al. v. Towers et al. (Md.), (106 Atl. 265, headnote 3): "When gas leaves the main lines through which it was transported in interstate commerce and becomes separated from the bulk of gas in such lines, and is forced into intermediate lines and the pipes

of the individual consumers, where it cannot return to the main line, and where it remains until used, it is so broken from the original package as to remove it from interstate commerce.'' In the present case, as we understand the facts, when gas has once passed the regulators, at the Junction, on the Missouri line and the Illinois line near the point of take off from the 22 inch line, or has passed the regulators between the 22 inch line and the meters on the premises of the customers south of the Junction, such gas is, so to speak, segregated for delivery, and cannot be returned to the main pipe line.

In the opinion by the Arkansas Supreme Court in the Department of Public Utilities case, supra, it is stated (108 S. W. (2d) l. c. 591) that the Gas Company in that case admitted that the original package was broken when the gas was delivered to a city distribution plant, but sought ''to distinguish this class of commerce from the individual sales made from its pipe lines to selected customers.''

Pennsylvania Gas Company v. Public Service Commission, 252 U. S. 23, 40 S. Ct. 279, 64 L. Ed. 434, involved the question as to whether the Public Service Commission of New York had power, under a statute, to regulate rates for natural gas furnished by the Pennsylvania Gas Company to consumers in Jamestown, N. Y. The Gas Company, in that case, was a Pennsylvania corporation and transported gas from Pennsylvania to New York by pipe line. It was held (252 U. S. l. c. 28) that ''the transmission and sale of natural gas produced in one State, transported by means of pipe lines and directly furnished to consumers in another State, is interstate commerce.'' It was said, however, that ''in dealing with interstate commerce it is not in some instances regarded as an infringement upon the authority delegated to Congress, to permit the States to pass laws indirectly affecting such commerce, when needed to protect or regulate matters of local interest. Such laws are operative until Congress acts under its superior authority by regulating the subject matter for itself. . . . The thing which the State Commission has undertaken to regulate, while part of an interstate transmission, is local in its nature, and pertains to the furnishing of natural gas to local consumers within the city of Jamestown in the State of New York. The pipes which reach the customers served are supplied with gas directly from the main of the company which brings it into the State, nevertheless the service rendered is essentially local, and the sale of gas is by the company to local consumers who are reached by the use of the streets of the city in which the pipes are laid, and through which the gas is conducted to factories and residences as it is required for use. The service is similar to that of a local plant furnishing gas to consumers in a city.'' It was held that the Commission could regulate the rates.

Memphis Natural Gas Co. v. Beeler et al. (March 30, 1942), 86 L. Ed. 745, 315 U. S. 649, involved an income tax on income derived from the sales, in Tennessee, of natural gas brought into the state by

interstate pipe line. It was the contention of the Gas Company in that case that to levy such a tax violated the commerce clause of the Constitution. The Supreme Court of Tennessee sustained the tax, and the cause reached the Supreme Court of the United States where the tax was also sustained. The Supreme Court of the United States said: "This court has often had occasion to rule that the retail sale of gas at the burner tips by one who pipes the gas into the state or by a local distributor acquiring the gas from another who has similarly brought it into the state is subject to state taxation and regulation," citing Public Utilities Commission v. Landon et al.; East Ohio Gas Co. v. Tax Commission; Southern Gas Corp. v. Alabama; Missouri v. Kansas Gas Co., supra, and Illinois Natural Gas Co. v. Central Illinois Public Service Co., infra.

In the present case the Gas Company, among other cases, relies upon State ex rel. Cities Service Gas Co. v. Public Service Commission, 337 Mo. 809, 85 S. W. (2d) 890; Illinois Natural Gas Co. v. Central Illinois Public Service Co. (Jan. 5, 1942), 314 U. S. 498, 62 S. Ct. 384, 86 L. Ed. 371; Federal Power Commission v. Natural Gas Pipe Line Co. (March 16, 1942), 62 S. Ct. 736. The purpose of the Cities Service case was to determine whether that company, which transported its gas by pipe line from other states was a public utility engaged, in Missouri, in the sale and distribution of gas and as such required, under our statute, to file schedule of rates.

The majority opinion, based, it would seem, on the theory of no agency relation existing between Cities Service and the distributing companies in Missouri, held that Cities Service was not subject to regulation in Missouri. But the purpose of the Cities Service case was vastly different from the purpose of the present case. Also, the ruling in that case was prior to the ruling in Southern Natural Gas Corporation v. Alabama, and Arkansas Louisiana Gas Co. v. Department of Public Utilities, supra.

Illinois Natural Gas Co. v. Central Illinois Public Service Co., supra, was a proceeding commenced by the Central Illinois Public Service Company to require the Illinois Natural Gas Company to supply the Central Illinois Public Service Company with natural gas and to establish the necessary pipe line connection for that purpose. The Illinois Commerce Commission made the order as asked by the Illinois Public Service Company, and was affirmed by the Supreme Court of Illinois. Central Ill. Pub. Serv. Co. et al. v. Illinois Natural Gas Co. et al., 375 Ill. 634, 32 N. E. (2d) 157. The Supreme Court of the United States reversed the order on the ground that such extensions and connections as required by the order were in violation of a statute, Sec. 717f (c), 15 U. S. C. A., a part of the Federal Natural Gas Act. The substance of the holding by the Supreme Court of the United States is stated in headnote 7 (62 S. Ct. 384) as follows:

"Where gas company which owned pipe line system located wholly in Illinois purchased from its parent corporation natural gas which

moved in continuous stream from points without the state into company's pipe lines within the state, an order of Illinois Commerce Commission requiring company to supply a distributor with natural gas, and to establish pipe line connection necessary for that purpose, was invalid because in conflict with provision of Natural Gas Act requiring certificate of convenience and necessity granted by Federal Power Commission for proposed extension and sale, regardless of whether 'interstate commerce' involved in bringing gas into the state ended before delivery to ▮ distributor.'' We do not deem it necessary to review other cases.

▮ The area of Meramec Junction grounds is 2 or 3 acres upon which the Gas Company maintains several buildings, among which are the laboratory building, the dispatcher's office, two meter and regulator houses, pump houses, etc. The dispatcher, among other duties, sees that the gas regulating equipment functions properly. The Gas Company, from the office of its assistant secretary in St. Louis, sends out monthly statements and collects, from its consumers, for the gas consumed and deposits collections in St. Louis banks.

Under the facts we think that the broken package rule should be applied to the sales of gas made by the Gas Company, and upon which the sales tax is claimed.

▮ Does Sec. 11409, R. S. 1939, exempt the gas sales from the sales tax? This section was enacted in 1939, Laws 1939, p. 860, and the part pertinent is as follows: ''There is hereby specifically exempted from the provisions of this article and from the computation of the tax levied, assessed or payable under this article *such retail sales as may be made between this state and any other state . . .* or between this state and any foreign country, and *any retail sale which the State of Missouri is prohibited from taxing under the Constitution or laws of the United States . . .*'' (Italics ours.)

This section was modified in 1941, Laws 1941, p. 702, by inserting the phrase *in commerce* after the word *made* in the 6th line as the section appears in the 1939 revised statutes. The Gas Company says that the gas sales, here concerned, are exempt under the above italicized provisions of Sec. 11409. In the brief of the Gas Company is this:

''Under either one of these provisions the pipe line's (the Gas Company's) sales to industries, being in interstate commerce, are exempted from the act. . . . By this language the Legislature undoubtedly intended to exempt transactions such as those involved in the case at bar.'' In the brief of the State Auditor it is stated: ''This statute specifically exempts from the computation of the tax levied 'such retail sales as may be made between this state and other states of the United States.' Of course, this language means sales between citizens of this state and citizens of any other state,'' and to this we agree. Sec. 11408, R. S. 1939, amended in 1941, Laws 1941, p. 701, but not as to the language here quoted, provides that the sales tax

shall be levied "upon every retail sale in this State of tangible personal property," and Sec. 11409 does no more than to exempt from the sales tax sales made in interstate commerce. We have held that the gas sales here involved were not made in interstate commerce, but were controlled by the broken package rule, therefore Sec. 11409 has no application.

That portion of Sec. 11409 in question is a statute exempting from taxation, and will be strictly construed against him who claims to be exempt under it, and no presumption will be indulged in favor of an exemption. In State ex rel. Spillers v. Johnston, 214 Mo. 656, l. c. 662, 113 S. W. 1083, it is said:

"It must be conceded to the State that, whether a tax exempting clause be viewed from the standpoint of the State down to the people or from the standpoint of the people up to the State, there be unbending and inviolate rules which as sure words of the law are always to be reckoned with; and those rules (from the standpoint of the State) are that an abandonment of the sovereign right to exercise the vital power of taxation can never be presumed. The intention to abandon must appear in the most clear and unequivocal terms (Railroad v. Cass County, 53 Mo. l. c. 27); and from the standpoint of the people they are that equality is equity in taxation. That the yoke of taxation—a forced contribution for governmental needs—should rest evenly on the necks of all citizens. That to relieve one but increases the burden of the other. That tax exemptions are in derogation of equal right—are contrary to common right—hence, are not to be favored by the courts, but should be construed strictly and confined to the subject specified including such as are necessarily within the contemplation of the legislation under review."

The modification of Sec. 11409 in 1941 by the insertion of the phrase *in commerce,* we think, lends support to our construction.

The judgment should be affirmed and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.