STATE of Missouri, Respondent,

v.

Edwin Frederick ZERBAN, Appellant.

No. 51687.

Supreme Court of Missouri,
Division No. 2.

March 13, 1967.

Charles M. Shaw, Clayton, for appellant.

Norman H. Anderson, Atty. Gen., Jefferson City, Claude W. McElwee, Jr., Special Asst. Atty. Gen., St. Louis, for respondent.

BARRETT, Commissioner.

Upon an indictment charging manslaughter in that on June 6, 1964, Edwin Frederick (Wimpy) Zerban by reason of culpable negligence (RSMo 1959, § 559.070, V.A.M.S.) in the operation of an automobile struck and killed Gerald A. Jaeger, a jury found the appellant guilty and fixed his punishment at seven years' imprisonment. RSMo 1959, § 559.140, V.A.M.S. Gerry Jaeger was killed in these circumstances: Shortly after midnight, 12:20 to 12:25, on June 5, 1964, Village of St. Ann policemen, Robert Rogers and Gerry Jaeger, were on traffic detail duty at the Airway Drive-in Theatre, 10600 block St. Charles Rock Road. They were setting up a portable flasher-light signal in the middle of the street across from the theatre entrance. The light had been set up "right at the center of the yellow lines" of the four-lane highway and Rogers had turned it on and it was flashing. As Rogers and Jaeger started walking toward the south side of the street they were struck by a fast-traveling black 1959 Ford Thunderbird convertible automobile and Officer Jaeger was killed. After striking the officers,

"(t)hey flew up over the left side of the car," the automobile "accelerated and continued west." The automobile was purchased by and registered in the name of "Edwin F. Zerban." There was no license on the vehicle on June 5th and 6th. The next afternoon at his parents' clubhouse on the Mississippi River, near Winfield, Wimpy Zerban was arrested by highway patrol Officers Hall and Palmer as the "white male" driver of the Thunderbird convertible that had struck and killed Officer Jaeger.

While he contends that his motions for acquittal should have been sustained, it may be said at the outset, although an entirely circumstantial evidence case, that by dint of prompt and thorough police investigation and a carefully organized presentation of testimony the appellant Zerban's guilt was established by an almost irrefragable set of circumstances. The state called thirty-two witnesses, some of them testifying to what at first blush might appear to be an insignificant circumstance but in context became a compelling fact pointing to the appellant's guilt. Therefore, except insofar as it directly relates to the appellant's assignments of error, it is not necessary to set forth the enormous detail necessary to demonstrate the compelling force and sufficiency of the state's proof to sustain the conviction. Suffice to say that the state carefully retraced and accounted for Wimpy's day in and out of Johnnie's Lounge, Hutch's Inn and Kraft's Miracle Lounge from 10:30 in the morning to his driving away drunk from Johnnie's Lounge shortly after 12 o'clock in his Thunderbird with the top down. He and "his girl" had had an "argument" and he had gone in and out of Johnnie's Lounge two or three times before he finally drove away alone.

The second assignment in his motion for a new trial is that his motions for acquittal should have been sustained because the state's evidence did not sustain its contention that the defendant "in operating his

automobile, as described in the evidence, was operating the automobile in a culpably negligent manner." State v. Schneiders, 345 Mo. 899, 137 S.W.2d 439. It is said in this connection that the state did not show that "the automobile was operated at an excessive rate or in a reckless manner." It is asserted that at best the evidence shows "a moderate rate of speed or only slightly in excess of the speed limit" (thirty miles an hour near the theatre entrance) and no circumstance indicating that the driver "omitted to do any act in the operation of the automobile which would give rise to culpable negligence." This assignment of error is so interrelated to his first assignment, perhaps dependent on it, that they may be considered as one.

At times the identification of the appellant as the driver of the automobile that struck and killed Officer Jaeger may have been inconclusive and the first assignment in his motion for a new trial is directed in part at least to this vital issue. After the appellant Zerban's day had been accounted for and after tracing the course of the Thunderbird and after three eyewitnesses to its hitting the policemen and speeding away, the state's twenty-first witness was Officer Edwards, a detective in the St. Louis County Police Department. Edwards said that on June 6, after Zerban had been arrested, he went to St. Ann and questioned the appellant about the occurrence in front of the Airway Drive-in Theatre. At this point defense counsel, the most experienced lawyer in St. Louis County if not the state in defending criminal causes, asked for "an interlocutory hearing" before the officer was permitted to testify. The jury was excluded and on direct examination Edwards said that the appellant had made an oral statement to him and that before it was made there were no threats or promises. On cross-examination he said that Zerban *had not admitted to him that he was driving the car that struck the two police officers.* He briefly related to the court and counsel what he had said and defense counsel made

this specific objection: "I object to his testifying to any statements of the defendant for the reason that by his own statement, by the witness' own testimony there is no incriminating nature to anything the defendant could have said, other than he does not know and that is inadmissible." The court overruled the objection and Officer Edwards testified that "Mr. Zerban said that on Friday, June 5th, it had been raining and as a result of the weather conditions it was not necessary for him to go to work that day. He told us he was a construction worker. That at about 10:30 or so the morning of Friday, June 5th, he visited, he began visiting several taverns and continued to do so throughout the day and that by about 1:00 p. m. he was pretty well intoxicated. That he didn't recall any of the events of that day after that approximate time of 1:00 p. m. in the afternoon." But as to the automobile that struck Officers Rogers and Jaeger: "He told us that he owned a 1959 Ford Thunderbird convertible and that the automobile had been in the repair shop at the Custom Auto Body Shop on St. Charles Rock Road since about the 15th day of May and that he was due to pick up the automobile on Friday, June 5th and that he did go to the Custom Auto Body Shop and paid money for the repairs on the automobile in the amount of $27.50 *but that he did not drive the car away from the repair shop that day.*" In his motion for a new trial the admission of this testimony is assigned as error for the reasons (a) that the "statement did not contain any matters that were incriminating to the Defendant as to the charge of Manslaughter," (b) that the statement "did not in any way add any links in the State's case of culpable negligence" and (c) that the statement as testified to by the officer was "in violation of the hearsay rule."

There is no problem here as to the voluntariness of any statement Zerban may have made, there was no such claim or objection and, of course, despite the hearsay rule, if he made any incriminating

statements, untrue denials evincing a consciousness of guilt, they would constitute admissions against interest and be admissible in evidence. State v. Harrell, Mo., 383 S.W.2d 554, 555; 22A C.J.S. Criminal Law § 730, pp. 1024–1033.

The first state's witness was the manager of the Custom Auto Body Shop and he said that on Friday, June 5, 1964, "about 5:00 o'clock, closing time" Zerban came to the body shop "to pay the deductible and pick up the car," a black 1959 Thunderbird convertible that he had repaired. This witness said that Zerban drove away and at that time there was no damage to the windshield, headlights or front end of the automobile. As indicated, several witnesses who knew Wimpy and his Thunderbird well saw it parked at Johnnie's Lounge, one, a regular habitue of Johnnie's, said that about 7:00 o'clock, at Wimpy's request, he had gone outside and "(h)elped push the car out toward the Rock Road so he could get it headed forward." At 11:45 a St. Ann patrolman on his way to pick up a relief officer passed Johnnie's and he saw a 1959 black Thunderbird parked there, he, as well as others, noticed the automobile because the top was down and it was raining. In a few minutes, shortly after 12, another friend and habitue of Johnnie's, standing at the bar and looking out a window, had seen Wimpy go outside, come back in and speak to his girl, go outside again and finally he testified, "He (Zerban) pulled out and left the premises" in the Thunderbird. The black automobile, top down, with a white male driving was next seen by Ervin Eltinge a quarter to a half mile east of the Airway Theatre as both drivers stopped almost abreast at a stop sign. State v. Carlson, 325 Mo. 698, 29 S.W.2d 135. Eltinge particularly noticed the car because "it kind of shoved me over onto the right side" (State v. Jones, 306 Mo. 437, 447, 268 S.W. 83, 86) and "(a)ll of a sudden he seemed to be accelerating at a greater speed and he left me behind." But as Eltinge followed and approached the theatre entrance the Thunderbird "seemed to be straddling the dividing line (yellow line) on the other side and he seemed to meet with two objects, which at that time I took for cardboard boxes, flying through the air." Ahead of Eltinge on St. Charles Rock Road was Jeffrey Rissman, a St. Louis University student, and his date Linda. As they approached the theatre entrance, driving in the outside lane, "a block and a half away" they saw two policemen in the street (State v. Bolle, Mo., 201 S.W.2d 158, 160) and immediately in the rearview mirror Jeffrey "noticed a car (a black Thunderbird with top down) coming up fast." As Jeffrey was "abreast of the two policemen" there was "a thud" and the officers and signal light were thrown "into the air" and the Thunderbird "accelerated and continued on west" at a speed of 50 to 60 miles an hour. The Thunderbird was next seen by Martin Poleski, 18, as he walked home from a date. He was walking on Ashby Road (Zerban's apartment was at 3528 Ashby Road, about one mile from Johnnie's Lounge) and saw a Thunderbird turn off of St. Francis Street onto Ashby, top down, and the right headlight out and to Martin it "seemed beat up" for a Thunderbird.

Shortly after Wimpy left Johnnie's Lounge the telephone rang and after a message from the barmaid Judy and Charles David and another drove to 3528 Ashby but were unable to arouse anyone. They saw Wimpy's Thunderbird, however, "at the end of the driveway on the side of the house" and David said, "I seen it was involved in a little mishap." They noticed that the windshield was "cracked and dirty and the front fender was banged up a little bit," one of the headlights was broken and by that time the top was up. Judy and David returned to Johnnie's, they had not been gone more than a few minutes, and there was Wimpy Zerban standing at the bar. When they walked in Wimpy "looked at me (David) and said he didn't know that he had hit anything. * * * I asked how come he didn't bring his car back" but he "didn't say anything." It

turned out that Paul Craig, a B. & L. Cab driver, had picked Zerban up at St. Matthew and Ashby Roads and driven him to Johnnie's. On the parking lot an acquaintance gave him change for a ten dollar bill from which he paid his cab fare. While the cab driver, Wimpy and his friend were yet on the parking lot a Bridgeton policeman appeared and "I asked him (Zerban) if he owned a car and he stated he did. * * * and his vehicle was—which was a 1951 Plymouth—was located in front of Johnnie's Lounge. He presented some keys to this automobile, Plymouth make keys, and asked me what the trouble was and I told him two police officers were struck and injured very seriously. *He said he knew of no one that owned a Thunderbird automobile* and that he was very sorry the officers were hurt and hoped they would get well." The officer went on his way and inside after a whispered hallway conference with his girl, Wimpy and Judy left in the Plymouth with Judy driving. They first went to his mother's home in St. Charles and then to the Zerban cabin near Winfield.

This may be a circuitous approach to the first assignment of error, but in this background Officer Edwards' testimony that Zerban had said to him "that he did not drive the car away from the repair shop that day" was certainly an "incriminating" statement and "a link in the state's case of culpable negligence." Edwards' testimony in the light of the other circumstances had a direct bearing upon and tended to establish that Zerban was the driver of the Thunderbird that struck and killed Officer Jaeger. State v. Feasel, Mo., 344 S.W.2d 41. While not positively identified along the entire route, he was seen entering and driving the automobile from Johnnie's Lounge and that particular automobile was traced almost every step of the way from Johnnie's to his home on Ashby, just a mile from its starting point. And in all these circumstances, as stated, the state appropriately charged the appellant with manslaughter by culpable negligence (State

v. Winkler, 309 Mo. 28, 273 S.W. 1040) and the proof, although circumstantial in part (State v. Simler, 350 Mo. 646, 167 S.W.2d 376), supports the jury's finding and verdict. State v. Feger, Mo., 340 S.W.2d 716; State v. Carlson, 325 Mo. 698, 29 S.W.2d 135; State v. Sumpter, Mo., 184 S.W.2d 1005, and State v. Bolle, supra.

The other three assignments of error all relate to given Instructions 1, 4 and 5. Instruction 4 was the conventional instruction informing the jury that voluntary drunkenness was not an excuse for the commission of an offense. It is urged that the giving of this instruction was error because "at no time did the Defendant ever raise the issue of intoxication and at no time did the Defendant ever attempt to use the issue of intoxication as an excuse for any actions of Defendant." Needless to say, the appellant may not be convicted merely because he was drunk or drinking but whether made an issue by the appellant or not, the extent of his drinking during the day and the degree of his intoxication or his sobriety were indeed relevant to the charge of manslaughter and were properly considered with all the circumstances upon the crucial and vital issue of culpable negligence. State v. Adams, 359 Mo. 845, 852, 224 S.W.2d 54, 58; 61 C.J.S. Motor Vehicles §§ 657 e, p. 766, 666 b (2), p. 789. There was considerable diversity of opinion whether Wimpy was drunk or sober. Some of his friends and companions said that he was intoxicated, some said that he was not, and some just couldn't be certain whether he was drunk or sober and in this category there was a police officer or two. He was a beer drinker and there were descriptions of his drinking throughout the day and evening and an empty beer bottle, probably from Hutch's Inn, was found in the Thunderbird. He had told Officer Edwards, so Edwards said, that he was intoxicated. His girl of three and a half years, Judy, was an experienced cocktail waitress and barmaid and she said that Wimpy was intoxicated (State v. Mayabb, Mo., 316 S.W.2d 609, 612) and thus as a

relevant issue to be resolved the jury could readily find the weight of the evidence. State v. Simler, 350 Mo. 1. c. 654–655, 167 S.W.2d 1. c. 382. In these circumstances, as appellant's counsel must know, even though not made an issue by him, it was not error to give the instruction on voluntary intoxication. State v. Sawyer, Mo., 365 S.W.2d 487, 492.

■ Instruction 5 told the jury that "any flight" of defendant was a circumstance for their consideration. It is said that the instruction is erroneous because "the Defendant did not flee in the legal sense so as to raise a presumption of guilt and give rise to the Court's instruction on flight." There was nothing in the instruction or elsewhere about "a presumption." 23A C.J.S. Criminal Law § 1185, p. 463. The circumstances have been set forth in part and it is not necessary to call specific attention to them again. In addition to the noted circumstances, two highway patrolmen went to the Zerban cabin about 11:45 on June 6 and there was no response to their knocks and calls. They returned about 1:45 in the afternoon with Mr. and Mrs. Zerban and after fifteen minutes or so were admitted and Wimpy was there and they placed him under arrest. It is not known what the assignment means by "flee in the legal sense," the facts were that the Thunderbird struck the officers while they were in the middle of the street, it did not stop; instead it speeded up and was left on Ashby bearing telltale marks. The appellant returned to Johnnie's and immediately left with Judy and in the early morning hours drove to the cabin on the Mississippi. From these circumstances, "flight," under any definition (State v. Aubuchon, Mo., 394 S.W.2d 327, 335) was a reasonable, permissible inference (State v. Cochran, Mo., 366 S.W.2d 360) and it was not error to give the instruction. State v. Williams, Mo., 382 S.W.2d 597, 598; State v. Bryant, Mo., 234 S.W.2d 584, 586.

Instruction 1 was the principal instruction, following the language of the indict-ment but in greater detail it hypothesized in brief the place and circumstances and required a finding that the appellant Zerban driving the described automobile feloniously and with culpable negligence struck and killed Gerald A. Jaeger. The instruction defined "feloniously" and "culpable negligence" and concluded by informing the jury of the possible punishments, ranging from a fine of $100.00 to not more than ten years' imprisonment. It is assigned that the instruction is erroneous in that it "does not properly define Manslaughter, nor does it properly define culpable negligence and it does not in any part of the instruction take any of the facts in this case relative to the operation of the Thunderbird automobile mentioned in evidence and apply those facts to Court's Instruction No. 1." It is said that the instruction does not embody excessive speed or "any careless or reckless driving on the part of the driver" but is a mere "abstract statement of the law as to manslaughter and culpable negligence."

■ Virtually all of these objections have been urged in one way or another against similar if not identical instructions. As indicated, somewhat in the language of the indictment the instruction hypothesizes certain essential facts which if found "shall be deemed manslaughter" (RSMo 1959, § 559.070, V.A.M.S.) and that is all the technical definition of manslaughter necessary. State v. Feasel, Mo., 344 S.W.2d 1. c. 45. As previously stated, speed, intoxication and other factors were properly established and considered by the jury along with other circumstances but it was not necessary that every evidentiary fact be specifically hypothesized and found. State v. Simler, 350 Mo. 1. c. 654–656, 167 S.W.2d 1. c. 382–383. Some of these factors, like the "intent essential to guilt in every lawful conviction * * * may be inferred * * * . from facts and circumstances tending to prove a defendant was actuated by a reckless disregard of the consequences of his negligent act." State v. Duncan, 316

S.W.2d 1. c. 617. "Every killing of a human being by * * * culpable negligence of another" (§ 559.070) is manslaughter and the instruction defined the term "culpable negligence" as "the omission on the part of a person to do some act, under given circumstances, which an ordinarily careful and prudent person would do under like circumstances, or the commission of some act, under given circumstances, which an ordinarily careful and prudent person, under like circumstances would not do, *such omission or action showing on the part of such person a reckless disregard for human life or limb, by reason of which omission or action another person is directly endangered in life or bodily safety*." This definition was preceded by a definition of "feloniously" and, of course, in the brief facts previously noted constituted manslaughter. In some cases there have been separate instructions of one or more of these matters or definitions, but the instructions are read as a whole and the definition here of "culpable negligence" is in essence the same as that in State v. Duncan, Mo., 316 S.W.2d 613, and other cases. State v. Hinojosa, Mo., 242 S.W.2d 1; State v. Studebaker, 334 Mo. 471, 66 S.W.2d 877. In its essentials the instruction is a revised, down-to-date rescription of the principal instruction in State v. Winkler, (1925) 309 Mo. 28, 273 S.W. 1040, and is a sufficient submission of facts, definition and theory and is not prejudicially erroneous for any of the reasons urged here.

For the reasons indicated the judgment is affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.